# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 15, 2012

## STATE OF TENNESSEE v. MONTEZ DAVIS

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 275913      Barry A. Steelman, Judge**

---

**No. E2011-02066-CCA-R3-CD - Filed December 13, 2012**

---

A Hamilton County Jury convicted Defendant, Montez Davis, of second-degree murder, reckless endangerment, and unlawful possession of a weapon. He received sentences of twenty-one years for second degree murder, one year for reckless endangerment, and one year for unlawful possession of a weapon, to be served concurrently for an effective twenty-one-year sentence in confinement. On appeal, Defendant argues: (1) that the trial court erred in denying the motion to suppress his statement; (2) that the evidence was insufficient to support his conviction for second degree murder; and (3) that the trial court improperly sentenced him. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

William H. Stover, Nashville, Tennessee, (on appeal), and Curtis Bowe, III, Chattanooga, Tennessee, (at trial), for the appellant, Montez Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, District Attorney General, Neal Pinkston, Assistant District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Background

*Suppression Hearing*

Detective Adam Emery of the Chattanooga Police Department, Major Crime/Homicide Unit, testified that at approximately 10:00 p.m. on the evening of January 9, 2010, he arrived at the scene of a shooting at the Kanku Gas Station located at 3440 Wilcox Boulevard. He observed the victim lying face-down in the parking lot, and some of the witnesses were still present, but they had not seen the shooter. While Detective Emery was on the scene, an officer and an investigator gave him information they had received that Defendant, also known as "Pooh," was the suspected shooter.

Detective Emery testified that a second shooting took place approximately "a mile and a half or two miles down the road" at 1006 Tunnel Boulevard, the home of Defendant's father. He learned that Defendant was at the residence, and Detective Emery had all parties from the residence transported to the Police Service Center. Detective Emery then left Kanku's and drove to the service center to conduct interviews of the individuals.

Detective Emery testified that Defendant had been at the service center for approximately three hours before he and Detective Michael Wenger began interviewing Defendant at 5:43 a.m. in their office. Detective Emery testified that Defendant was the last person to be interviewed, and he had been sitting in a waiting area where he could not speak to any of the other parties. Detective Emery did not talk with Defendant while he was in the waiting area. Detective Emery testified that he and Detective Wenger began filling out the waiver of rights form with Defendant by obtaining personal information such as Defendant's name, date of birth, and social security number. Defendant was nineteen years old, said that he had an eleventh-grade education, and indicated that he could read and write. Detective Emery then advised Defendant of his *Miranda* rights and turned on the tape recorder. He wrote on the waiver of rights form and advised Defendant that he had charges pending against him. The form reflected charges of first degree murder and reckless homicide. At that time, a witness had identified Defendant as the shooter at the Kanku's.

Detective Emery testified that the waiver of rights form was read to Defendant, and Defendant also read it. He initialed the areas indicating that he understood his rights. Defendant then waived his rights and gave a statement. Detective Emery testified that he did not re-advise Defendant of his *Miranda* rights when Detective Wenger asked a question or when Defendant was questioned about each location. Detective Emery acknowledged that at one point during the interview, Defendant asked the meaning of the word "remorse." He

said that he did not threaten or coerce Defendant, and he did not refuse Defendant food, water, or anything of that nature. Detective Emery testified that Defendant voluntarily waived his rights. He said that Defendant was formally charged at approximately 7:00 a.m.

Defendant testified that he arrived at the Police Service Center in handcuffs, and he remained in handcuffs until Detective Emery finished with him. He said that he did not understand what was going on. Defendant testified that Detective Emery had filled in the waiver of rights form prior to questioning and indicated that Defendant would be charged with first degree murder and reckless endangerment.

Defendant testified that he did not understand the waiver of rights form, and he signed it because he was nervous. He did not think he could ask questions or that he could leave. He further understood that he was a suspect and not a victim. Defendant testified that the detectives questioning him talked back and forth about the shooting at Kanku's and at his father's house on Tunnel Boulevard. He said that the detectives did not re-advise him of his rights as they talked about each location or when a different detective asked him a question. Defendant testified that before Detective Emery reviewed the form with him, he asked what happened. He said that Detective Emery then reviewed his rights with him.

On cross-examination, Defendant "[k]ind of" felt that Detective Emery forced him to give a statement, and he said that he was "spooked" and "scared" at the time. Defendant testified that he first felt like a suspect when police arrived at the house at 1006 Tunnel Boulevard, and " started feeling on [his] chest, like, trying to see if [his] heart [was] beating fast." He told them his name and they said, "You the guy [we're] looking for." Defendant was then taken to the Police Service Center in a police vehicle and placed in a waiting area. He and everyone else who had been brought to the station were in handcuffs the entire time. Defendant testified that he had been arrested by police on previous occasions and taken to jail.

Defendant testified that he did not complete eleventh grade because he was bullied and dropped out of school. He admitted that he knew how to read and write. Defendant testified that he provided Detective Emery with his personal information, and Detective Emery read his rights to him. However, he said that Detective Emery did not give him an opportunity to read his rights. Defendant testified that he initialed the form each time Detective Emery read one of his rights to him, not because he read them himself. He said that he did not "really" understand his rights because he was nervous. Defendant said he understood that he had the right to remain silent. He testified that he did not understand that anything he said could be used against him in court or that he had a right to an attorney and that one could be appointed to him if he could not afford an attorney. However, Defendant admitted that he initialed that he understood those rights. He further testified that he did not

understand that he had a right to stop answering questions. Defendant said that Detective Emery did not threaten him. He further admitted that the first time Detective Emery asked about the "incident" was when he asked what happened.

*Trial*

On the night of January 9, 2010, Ms. Jacoby Daniels and Kerrea Jones stopped at the Kanku Gas Station located at the corner of Wilcox Boulevard and Tunnel Boulevard to get gas after attending a high school basketball game. Ms. Daniels, who was driving, pulled up to the pumps and saw the victim, Jonathan Lawrence, whom she had known for approximately six years. At the time, there were other vehicles and individuals at the gas station. It was very cold outside, and the victim offered to pump her gas. The victim indicated that he would be right back and was walking across the street when Ms. Daniels heard gunshots. She pulled away from the gas pump and drove down the road. Ms. Daniels eventually pulled over at Food Lion because Ms. Jones attempted to roll up the passenger side window and noticed that the glass was gone and the button was broken. She wanted to make sure that she had not been hit by a bullet.

Ms. Daniels drove back to Kanku's to call police, and she saw the victim lying in the parking lot by a gas pump. She and Ms. Jones pulled in the parking lot to try to help the victim. At that time, some of the gas station attendants also came out. When she got out of her car, Ms. Daniels noticed that the passenger door had been struck by a bullet. Ms. Daniels later spoke with police and told them what had happened.

Inah Gardner, her children, and some other children also attended the high school basketball game on January 9, 2010, and Ms. Gardner stopped by Kanku's after the game to meet her sister. After the meeting, Ms. Gardner drove to a nearby "teen" party, sat in the parking lot for approximately ten minutes, and then left to take one of the children with her home. As Ms. Gardner drove back by Kanku's on Wilcox Boulevard toward Tunnel Boulevard, she saw Defendant in front of her driving a white SUV. Defendant turned right into Kanku's, and Ms. Gardner continued driving toward the traffic light. She glanced over and noticed that the passenger side window was broken out of Defendant's vehicle. Ms. Gardner testified that when Defendant drove through the parking lot, she "saw a lot of individuals on the passenger side of his vehicle." She then saw Defendant outside the vehicle with the driver's door open facing the crowd at "the far end, like, exiting, like, onto Tunnel Boulevard . . ." Ms. Gardner heard gunshots and drove away. She did not see who was firing a weapon. Ms. Gardner testified that she turned right on Tunnel Boulevard, and she saw Defendant pull in behind her traveling at a high rate of speed. She pulled over and let Defendant go by. Defendant then turned left into his grandmother's driveway.

-4-

Ms. Gardner continued driving and received a phone call from a friend who told her that someone had been shot and killed at the Kanku Gas Station. Ms. Gardner told her friend that "[s]omebody was shooting that I know but ain't nobody dead." Her friend insisted that someone had died, so Ms. Gardner decided to drive back by the gas station. Ms. Gardner testified that she dropped one of the children off on Dee Drive, and as she drove back by Defendant's grandmother's home, gunfire erupted, and a bullet struck Ms. Gardner in the hand. She then drove back to Kanku's for help because she knew that police would be on the scene. Ms. Gardner saw the victim lying on the ground next to a gas pump. She spoke with police and later went to the Police Service Center and gave a recorded statement.

Detective Adam Emery of the Chattanooga Police Department responded to Kanku's at approximately 10:00 p.m. Other officers were on the scene when he arrived, and he had them expand the crime scene to encompass all of the Kanku parking lot. Detective Emery observed a bullet hole in Ms. Daniels' car, and a maroon Jeep Cherokee driven by Defendant's sister, Dosha Davis, also had bullet strikes. Detective Emery walked into the store, spoke with employees, and viewed the surveillance video. In the video, he saw a white Jeep Patriot drive across the parking lot, "and there's a party that moves towards the vehicle in an action later determined in investigation that he was throwing something at it, and it moved straight past, goes out of camera view, you don't see it, and then, you know, 30 seconds or less, and then you see everybody scatter, so that's basically the video that I saw." The actual shooting was not reflected on the video. Detective Emery also observed several males get into a large SUV after the shooting, and it appeared that as they were leaving the parking lot, one of the individuals was pointing a rifle out the window as they drove toward Tunnel Boulevard.

Detective Emery and other investigators interviewed several witnesses on the scene. They were aware that there had been another shooting down the road at 1006 Tunnel Boulevard. Through his investigation, Detective Emery learned that Defendant was on the scene at 1006 Tunnel Boulevard and that he was a potential suspect in the shooting at Kanku's. Defendant was then transported to the Police Service Center to be interviewed. Detective Emery and Detective Wenger advised Defendant of his *Miranda* rights, and Defendant signed a waiver of rights form. Defendant then gave a recorded statement. He initially said that he and Juane Howard were in the white Jeep Patriot, a rental vehicle, when he saw his sister's maroon Jeep Cherokee parked in Kanku's parking lot. Defendant said that he pulled into the parking lot, and as he began to turn around, someone threw a bottle that broke a small window on the passenger side of the SUV. Defendant initially told detectives that he immediately drove off and went to his father's house. He claimed that he did not hear any shots fired because the radio was on.

Defendant then told detectives that Juane Howard had a gun that he was trying to point out the window, but Mr. Howard did not fire the weapon. He said that he "zoomed off" when they heard shots. Defendant eventually admitted that after someone hit the Jeep with a bottle, he drove to the end of the parking lot, got out of the vehicle, and began shooting with a Glock .40 that he fired three times into the air. Defendant told Detective Emery that he did not know who threw the bottle nor did he pay attention to who was in the parking lot. Detective Emery confronted Defendant about the direction in which he was holding the gun, and Defendant admitted that he pointed the gun "[l]ike, towards the store. Like towards Russell and them. Whoever was standing out there." Defendant said that he was angry because the "Bloods" were always picking on him, and he decided to fire at the crowd of people because they hit his vehicle with a bottle. The only person that he noticed in the crowd was his sister. Defendant told Detective Emery that he did not see "Russell" in the crowd, but Mr. Howard told him that "Russell" threw the bottle. Defendant said that when he shot into the crowd, he was shooting at "Russell." He told Detective Emery that he did not intend to kill the victim, and he did not see the victim fall when he shot him. Defendant admitted that he was the only one who had a gun at the time of the shooting.

Investigator Kenneth Burnette, Jr. of the Chattanooga Police Department's Crime Scene Unit collected five shell casings and one projectile from the scene at Kanku's. The casings were identified as brass .40-caliber Smith and Wesson. Investigator Burnette observed the victim's body lying face down beside pump 8 with his hands in his pockets. He later tested a white, four-door vehicle for gunshot residue (GSR). Investigator Gregory Mardis of the Crime Scene Unit processed Ms. Daniels' red Honda Accord and recovered a projectile from the passenger door.

Brian Russell of the Crime Scene Unit responded to the scene at 1006 Tunnel Boulevard. He collected a total of eleven rifle shell casings from the street and sidewalk in front of the residence. The mailbox had also been knocked over. While waiting for a search warrant to be obtained for the residence, Investigator Russell went to the service center to process those individuals who had been taken into custody. He later returned to Tunnel Boulevard. He recovered a total of eighteen spent .40-caliber and .45-caliber shell casings from the driveway and toward the rear of the house. Investigator Russell observed bullet strikes to the house and to a vehicle parked at the residence. A white Jeep Patriot was parked behind the house with the rear passenger vent window broken out. Investigator Russell also found a Smith and Wesson model SW-40 VE .40-caliber semi automatic pistol on the ground next to a boat. He performed GSR tests on the Jeep Patriot, and he collected projectiles from the residence. At some point, Detective Russell collected defendant's clothing and a projectile from Ms. Gardner's vehicle.

Dr. James Metcalfe performed an autopsy on the victim. Dr. Metcalf testified that the victim died as the result of a gunshot wound to his neck that severed the external carotid artery on the left side of his neck and both the internal and external carotid arteries on the right side of his neck.

Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) Crime Lab testified that he received evidence from two different locations in the present case. He test-fired the Smith and Wesson .40-caliber pistol found at the scene on Tunnel Boulevard and determined that a number of the shell casings from the driveway were fired from the weapon. Some of the shells were fired from a Glock. Agent Scott also received five .40-caliber Smith and Wesson shell casings from the scene at Kanku's on Wilcox Boulevard. He determined that the casings had been fired through a Glock pistol, and he noted that they were fired from the same Glock pistol as a number of the casings from Tunnel Boulevard. Agent Scott testified that the .40-caliber Smith and Wesson bullet recovered from a red Honda Accord was also fired from a Glock pistol.

Agent James Davis of the TBI Crime Lab received Defendant's clothing and samples taken from the Jeep Patriot to test for GSR. He testified that "gunshot primer residue" was not found on any of Defendant's clothing. Agent Davis testified that the samples taken from the exterior rear driver door, the exterior rear passenger door, the inside left front door, the inside left rear door, and the inside front passenger door areas revealed the presence of "gunshot residue primer." The samples from the exterior left front and the exterior front passenger door did not contain "gunshot primer residue." Agent Davis testified that it was not unusual for an individual to fire a weapon and there be no GSR on the person's clothing.

The defense called Mariah Cosper, who testified that she attended a basketball game on January 9, 2010, and left at approximately 8:00 p.m with her daughter and her friends, "Charice" and "Christian." She stopped at Kanku's to get gas and a saw a group of ten to fifteen males dressed in red and white clothing standing around the last gas pump. Ms. Cosper pumped her gas and got back inside the car to leave. However, a green SUV that had been circling the parking and "throwing up gang signs" stopped in front of Ms. Cosper's car. While Ms. Cosper was waiting for the SUV to move, she heard a gunshot and "then the car that was on the side of us, they got out [of] the car and was, like, running towards the store, then you hear more gunshots and they jumped back in the car, so we ducked in the car."

Ms. Cosper testified that the green SUV and all of the other vehicles rushed out of the parking lot. As she began to pull away, Ms. Cosper saw the victim's body lying on the ground, and her friends got out of the car and checked on him. One of them dialed 911. Ms. Cosper testified that they remained in the parking lot until police arrived and told them to leave. She said that the police did not ask for her name or any information.

On cross-examination, Ms. Cosper testified that she had known Defendant for a while, and her friend, Charice Nash, was Defendant's cousin. She admitted that she did not contact police and tell then what she witnessed at Kanku's. Ms. Cosper testified that she saw a white Jeep in the parking lot on the night of the shooting. She did not see who was inside the vehicle but later learned that it was Defendant.

Defendant's cousin, Charice Nash, was at Kanku's on January 9, 2010, with Ms. Cosper. She testified that while they were parked at a gas pump, a dark green SUV full of black males was circling the parking lot. Ms. Nash testified that the SUV eventually stopped in front of Ms. Cosper's car, and some of the males got out. She saw Defendant pull up, and some of the men from the SUV approached Defendant's vehicle and said some things to him but Defendant did not say anything back. Ms. Nash then heard gunshots, and Defendant drove off, and the men in the SUV drove away. She did not see Defendant with a weapon.

Ms. Nash testified that she ducked when she heard the gunshots, and everyone "zoomed off." She thought the shots sounded as though they were coming toward them. When she looked up, Ms. Nash saw the victim lying on the ground. She got out of the car, ran over to the victim, and then dialed 911. Ms. Nash testified that the victim moved one time before becoming still. She said that police arrived, covered the victim, and told them to leave. Ms. Nash testified that police did not ask for her name, address, or phone number.

Defendant's mother, Kaliqua Johnson, testified that Defendant attended Brainerd High School until the eleventh grade. She said that his grades were not good because he did not attend school often because he was being "harassed by these guys." Ms. Johnson testified that defendant did not understand what was going on in class, and he would get frustrated doing homework. She felt that Defendant was "slow." Ms. Johnson was not aware that Defendant obtained a Glock .40–caliber handgun three days before the shooting.

## II. Analysis

### I. Motion to Suppress

Defendant contends that the trial court erred in failing to grant his motion to suppress the statement he gave to police. He contends that he lacked the "requisite education and mental capacities to understand what was happening during his interrogation." Defendant further contends that when he signed a waiver of his *Miranda* rights, he thought that detectives were questioning him about his involvement in a second shooting that occurred at his father's house on Tunnel Boulevard. He argues that detectives should have re-advised him of his rights when they began talking about the shooting that occurred at the Kanku Gas Station on Wilcox Boulevard. We disagree.

-8-

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to the facts *de novo,* however. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom,* 928 S.W.2d at 23.

The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to safeguard this privilege against compulsory self-incrimination. *Id*. at 444. More specifically, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. Those safeguards include the now familiar *Miranda* warnings - namely, that the suspect be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. at 479. If the police fail to provide these warnings, any statement obtained as a result of custodial interrogation will not be admissible at trial during the prosecution's case-in-chief, even if the statement is otherwise voluntary. The *Miranda* Court was concerned that the "interrogation environment" created by interrogation and custody would "subjugate the individual to the will of his examiner" so as to undermine the privilege against compulsory self-incrimination. *Id*. at 457-58. In *Dickerson v. United States,* the United States Supreme Court reaffirmed that "*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts." 530 U.S. 428, 432 (2000); *see also State v. Walton*, 41 S.W .3d 75, 82 (Tenn. 2001). Consequently, if the defendant's statement resulted from custodial interrogation, the statement must be excluded from evidence if the police failed to provide the defendant *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *Walton*, 41 S.W.3d at 86.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Thereafter, the United States Supreme Court has explained that "interrogation" refers not only to express questioning but also to any words, actions, or practices that the police should

know are reasonably likely to elicit incriminating information from a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Walton*, 41 S.W.3d at 85.

The Tennessee Supreme Court has held that "[a] valid waiver of *Miranda* rights remains valid unless the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *State v. Rogers*, 188 S.W.3d 593, 606 (Tenn. 2006)(citing *Wyrick v. Fields*, 459 U.S. 42, 47 (1982)). Furthermore, "[c]ourts must examine the totality of the circumstances to determine whether renewed warnings are required." *Id.*

> The factors to be considered when assessing the totality of the circumstances include: 1) the amount of time that has passed since the waiver; 2) any change in the identity of the interrogator, the location of the interview, or the subject matter of the questioning; 3) any official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) any indicia that the suspect subjectively understands and waives his rights. Because of the infinite variety of circumstances a case may present, the list of factors is by no means exhaustive. The weight to be accorded different factors will vary depending on the particular facts of the case.

*Rogers*, 188 S.W.3d at 606 (internal citations omitted).

Concerning this issue, the trial court noted that the detectives reviewed the waiver of rights form with Defendant and read his rights to him. Defendant initialed that he understood each of those rights. Defendant testified at the suppression hearing that Detective Emery did not talk to him about the case until he had reviewed the waiver of rights form. The trial court found that Defendant, who was nineteen years old and had completed one semester of the eleventh grade, "was of sufficient maturity to understand these rights." The court further noted that when Defendant did not understand the word "remorse," he asked the detective what it meant. Therefore, if Defendant did not understand his rights, the trial court felt that Defendant would have asked a question. The court found that Defendant's "will" was not "overborne" by the detectives, and Defendant at no time acted as though he did not want to cooperate. As for whether Defendant should have been re-advised of his rights during the interrogation, the trial court made the following findings:

> With regard to these factors to be considered when assessing the totality of the circumstances, "The amount of time that has passed since the waiver." This was a 50-minute statement. I think what the Court is talking about here is whether or not the defendant has signed a waiver and the detectives then might go back - - what I'm saying is, the Court that wrote this opinion, I think what

-10-

they may be talking about is where the defendant signs a waiver . . . and then the detectives go back later, and, after a significant amount of time has passed, and seek to continue the questioning some time significantly after the waiver has been signed. The Court doesn't find that exists here. The defendant signed a waiver at 5:46 a.m. and the statement was over by 6:33 a.m., so it's about 50 minutes.

"Any change in identity of the interrogator or the location of the interview or the subject matter of the questioning." Here the Court doesn't find that within a 50-minute time slot that there was such a change in the identity of the interrogator, because there were two interrogators in the room at the time that the questioning began, and those interrogators were both witnesses to the rights waiver, and they both were questioning during the course of this 50 minutes.

The location of the interview did not change. It stayed within the room that it was recorded in within the 50 minutes, and the subject matter of the questioning did not change except to the extent that the police asked not only about the shooting at the Kanku's, but then a subsequent shooting later that same day that the police were investigating as part of this incident. So the Court doesn't find that, under the totality of the circumstances, that those factors would cause the statement to be suppressed.

Three, "Any official reminder of the prior advisement." The Court doesn't believe that an official reminder is necessary where the entire statement is 45 to 50 minutes.

The subject - - "The suspect's sophistication or past experience with law enforcement." The Court has already addressed that.

And "Any indicia that the suspect subjectively understands and waives his rights." The detectives [were] in the room with him at the time, and he testified that the defendant understood what his rights were.

The defendant's rather soft-spoken, he was soft-spoken here today, he was soft-spoken at the time that the statement was made. The Court listened to the statement, heard the detectives, heard the defendant. For the most part, it did not appear that it was really adversarial in nature.

There were times where detective, Emery in particular, was getting frustrated with the defendant, but the Court doesn't find that it's such that it is outside the bounds of what would be allowed in an interrogation, or that it was, again, that it was overbearing.

We agree with the trial court. Evidence presented at the suppression hearing established that Defendant was nineteen years old at the time that he signed the waiver of rights form and gave a statement. He had an eleventh-grade education, and he indicated to Detectives that he could read and write. Detective Emery testified that he read the waiver of rights form to Defendant and advised him of his *Miranda* rights. Defendant initialed the form indicating that the understood each of those rights. There was nothing presented at the suppression hearing indicating that Defendant lacked the "requisite education and mental capacities to understand what was happening during his interrogation."

As for whether Defendant should have been given renewed *Miranda* warnings during his interrogation, the proof showed that approximately forty-five to fifty minutes passed from the time Defendant signed the waiver of rights form until the end of the interrogation. In *Rogers*, our Supreme Court, in considering the totality of the circumstances to determine whether renewed warning were required, concluded that five hours between the waiver of *Miranda* rights and the subsequent custodial interrogation "did not constitute a significant time lapse." *Rogers*, 188 S.W.3d at 607. The Court also pointed out that Tennessee cases have upheld the admissibility of statements that were made the day after the administration of *Miranda* warnings. *Rogers*, 188 S.W.3d at 606-607 (citing *Reaves v. State*, 523 S.W.2d 218, 220 (Tenn. Crim. App. 1975); *Mitchell v. State*, 3 Tenn. Crim. App. 153, 458 S.W.2d 630, 633 (1970)).

There was no change in the identity of the interrogator because both detectives were present in the room with Defendant when he was advised of his rights, and both detectives participated in the interview. Although Defendant was questioned about shootings at two different locations, the Kanku Gas Station on Wilcox Boulevard and his father's house on Tunnel Boulevard, the two shootings were related and occurred within a short time and a close distance of one another. From a review of the transcript of the interview, it is quite clear as to which location detectives were referring during the questioning, and Defendant's responses related to the appropriate location. Although Defendant received no official reminder of the prior advisement, he was continuously in the presence of Detectives Emery and Wenger. *See Rogers*, 188 S.W.3d at 607. There was proof that Defendant had past experience with law enforcement based on his charges of drug possession, possession of a firearm, and driving offenses. As to whether there was any indicia that Defendant subjectively understood and waived his rights, we have noted above that Defendant was nineteen years old, had an eleventh-grade education, and indicated that he could read and

write. There was no proof that he did not understand his rights, and he signed the waiver of rights form.

Based on our review of the totality of the circumstances surrounding the giving of Defendant's statement, we conclude that the evidence does not preponderate against the trial court's finding that admission of Defendant's statement did not violate Fifth Amendment principles. The trial court properly denied Defendant's motion to suppress, and Defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

Next, Defendant challenges the sufficiency of the evidence for his second degree murder conviction. He argues that the State did not prove that he "knowingly killed someone at the Kanku's Market." When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle,* 914 S.W.2d 926, 932 (Tenn. Crim. App.1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W. 3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b). Furthermore, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, the proof showed that Defendant knowingly shot at least three times into a crowd of people at the Kanku Gas Station because someone threw a bottle at his vehicle, breaking out a window. A bullet struck the victim in the neck, killing him. In his statement to police, Defendant said that when he shot into the crowd, he was shooting at "Russell," the person he thought had thrown the bottle. After the shooting, Defendant fled the scene. As pointed out by the State, this Court has held that the deliberate firing of shots at a person constitutes "knowing" conduct for the purpose of establishing second degree murder. *See State v. Rickie Reed*, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *5-6 (Tenn. Crim. App. Oct. 31, 2002)( "[A]ppellant deliberately shot into a moving vehicle with a high powered assault weapon, clearly aware that his actions could result in the death of an individual."); *State v. Kenneth Anthony Henderson*, No. M1999-00547-CCA-R3-CD, 2002 WL 537042, at *4 (Tenn. Crim. App. Apr. 11, 2002)(Evidence sufficient for second degree murder when Defendant and at least one other person fired multiple shots at two men in a parked car killing one of them.).

Defendant argues that "the facts taken in the light most favorable to the State indicate that Mr. Davis may have acted in disregard to human life in shooting his gun. He may have been reckless." Defendant was originally charged with first degree murder, and the trial court instructed the jury on the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. As was their right, the jury convicted Defendant of second degree murder obviously rejecting Defendant's claim that he acted recklessly and not knowingly. This court has repeatedly held, in distinguishing second degree murder from voluntary manslaughter, that the degree of homicide in the killing is for the jury to decide. *Wilson v. State*, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978); *State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001); *State v. Thomas L. Jones*, No. W2000-01028-CCA-R3-CD, 2001 WL 1117526, at *3 (Tenn. Crim. App. Sept. 24, 2001) app. denied (Tenn. Mar. 4, 2002).

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's conviction for second degree murder. Defendant is not entitled to relief on this issue.

*III. Sentencing*

Finally, Defendant argues that the trial court erred in applying certain enhancement factors to his sentence for second degree murder and that the trial court failed to consider certain mitigating factors. Previously, our review of a defendant's challenge to the length, range, or manner of service of a sentence was de novo with a presumption of correctness. However, our supreme court recently adopted a new standard of review for sentencing in

light of the 2005 changes in Tennessee sentencing law. *State v. Bise*, _____ S.W.3d _____, 2012 WL 4380564 (Tenn. Sept. 26, 2012). In *Bise*, the court concluded:

> In summary, the 2005 amendments to the 1989 Act were intended to bring our sentencing scheme in line with the decisions of the United States Supreme Court in this area. Accordingly, when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the "presumption of correctness" ceased to be relevant. Instead, sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness."

*Bise*,_____ S.W.3d _____, 2012 WL 4380564 at *19. Accordingly, we now review a defendant's challenge to the sentence imposed by the trial court under an abuse of discretion standard with a "presumption of reasonableness." *Id*.

> Tennessee's sentencing act provides:
>
> (c)  The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)  The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2)  The sentence length within the range should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c)(1)-(2).

In conducting a review of a sentence, this court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-

113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also State v. Carter*, 254 S.W.3d 335, 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

A trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*., 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts"). In *Bise* the court concluded:

> We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*,_____ S.W.3d _____, 2012 WL 4380564 at *17.

Defendant only challenges his sentence for second degree murder, a Class A felony, with a sentencing range of fifteen to twenty-five years as a Range I offender. T.C.A. §§ 39-13-210(c); 40-35-112 (b)(1). The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the Defendant, before trial, failed to comply with conditions of a sentencing involving release into the community; the Defendant possessed or employed a firearm during the commission of the offense; the Defendant had no hesitation about committing a crime when the risk to human life was high, and the Defendant at the time the felony was committed was released on probation. Tenn. Code Ann. § 40-35-

114 (1), (8), (9), (10), and (13). The trial court also applied one mitigating factor: the Defendant, because of youth or old age, lacked substantial judgment in committing the offense. Tenn. Code Ann. § 40-35-113 (6).

Defendant argues that the trial court erred in applying two of the enhancement factors and that the trial court failed to consider additional mitigating factors. However, we conclude that this precise argument is no longer proper grounds for appeal under our supreme court's decision in *Bise*. As previously discussed, the court in *Bise* held that even if a trial court misapplies an enhancement or mitigating factor, the sentence is not invalidated unless the trial court "wholly departed from the 1989 Act, as amended in 2005." *Bise*,_____ S.W.3d _____, 2012 WL 4380564 at *17. In this case, the trial court sentenced Defendant to twenty-one years for second degree murder, a sentence consistent with the purposes and principles of sentencing and within the appropriate range.

The record clearly shows that the trial court followed the statutory sentencing procedure and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the trial court did not abuse its discretion by imposing a sentence of twenty-one years for Defendant's second degree murder conviction.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-17-